WALTER BREEN *vs.* RAILWAY TRANSFER CO. OF MINNEAPOLIS.

Argued July 1, 1892.   Decided July 22, 1892.

**Evidence Considered.**

Evidence considered, and *held* sufficient to warrant the submission of the case to the jury.

**New Trial—Evidence.**

*Held, also,* that upon the state of the evidence, as appearing upon the record, it was not reversible error for the trial court to order a new trial in the action.

Appeal by plaintiff, Walter Breen, from an order of the District Court of Hennepin County, *Hicks,* J., made March 14, 1892, granting a new trial.

The plaintiff was in the employ of the Washburn-Crosby Company, assisting in loading cars with flour at the mill known as the Washburn "C" Mill, in Minneapolis. The defendant, the Railway Transfer Company of the City of Minneapolis, operated a railway between the different lines of railway and the mills and manufactories in Minneapolis, switching in cars and taking them out and transferring cars between the various lines of railway and the Washburn "C" Mill. Directly in front of the mill, and running parallel to the platform, are three railway tracks. The one next the platform is called the inside track, the one next to that the middle track, and the other, the main track. The inside and middle tracks united with the main track a few hundred feet either way from the mill. The empty cars for the mill were usually set in by defendant from the north onto the side tracks. When loaded with flour at the mill, they were taken out to the south. Sometimes, after the cars were loaded, the defendant would shove them down the track to the south by bunting the incoming empty cars against them with considerable force, and sometimes the mill men would shove them down by hand, to make place for other cars to be loaded. There were twenty-five to thirty cars loaded daily from the mill, keeping a crew of about fifteen mill men continually in the work of loading. The foreman of the mill crew would order the defendant by card to place upon the track in front of the mill the number and kind of cars wanted by them, and while defendant's switching crew were procuring the cars thus ordered, from the different lines of road, the mill crew would continue loading cars already in place. The men engaged in loading the cars at the mill were not always in a position to see the incoming cars, and it was customary for some of the men upon the cars constituting the "new set" to call out or otherwise notify some member of the mill crew when cars were coming, so that the men engaged in the work of loading the cars at the mill might remove the skids used in loading, and prevent accidents when the incoming cars were pushed against the standing cars. The notice was

usually given to some member of the mill crew by some member of the train crew, usually the foreman, who would drop off the train as it passed up on the main line before backing down to the mill on the inside switch track. The cars usually backed down slowly to the mill on the inside track, unless the mill men desired to have the loaded cars shoved down by the incoming cars, in which case the train crew would back down the incoming cars onto the loaded cars with sufficient force to drive them away from the doors of the mill, and down the track to a point below a crossing. There was evidence of a custom that this desire of the mill crew should be signified to the train crew by the presence on top of the loaded cars of one of the mill men, and that this might be taken by the train crew as a signal to bunt the loaded cars down the tracks.

On November 25, 1890, about 9 A. M., there were two cars on the inside track in front of the doors of the mill, being loaded by the mill crew, of which the plaintiff, Walter Breen, was a member. Dennis McHugh, the assistant foreman of the crew, made an order by switch card, directing the defendant to place four cars upon the inside track, and four cars upon the middle track. The order was delivered to James Neil, the foreman of defendant's switching crew, who went to the yard to get the cars, the mill crew continuing the work of loading. Neil was able to get but three cars, which were brought up on the main line past the mill to the switch track, and then switched onto and backed in on the inside track down onto the cars being loaded in front of the mill with such force that the cars being loaded were shoved some fifty feet down the track; the skid running from the mill door to the car door was broken, and the plaintiff, who was at work helping load the car, was caught between the mill and the skid, and injured.

This action was brought to recover damages for the injuries so received. The negligence complained of was the backing down of the incoming cars with too much speed onto the cars being loaded, without sufficient warning to the mill crew. The evidence tended to show that the cars were backed down with considerable speed; at just what rate of speed the testimony was conflicting. The train men failed to give the formal and customary notice of the approach of the cars, but

McHugh, the assistant foreman of the mill crew, who ordered the cars, was standing near the main track when the three cars went past the mill on the main track, and saw the cars go up to the switch block and switch back on the inside track. McHugh testified that he did not know the cars were intended for the mill until after they were coming down the inside track, and that they were then going so fast that he had no time to, and was afraid to cross the track and notify the mill men; but other testimony tended to show that McHugh talked with Neil, the foreman of the switching crew, who jumped off the cars as they passed the mill on the main track, and learned from him that the cars were intended for the mill, and were going to come down the inside track. The testimony further showed that Rouse, one of the mill men, was standing on the top of one of the cars that were being loaded, at the time the new cars were coming down the inside track, though Rouse testified that he was not on the cars for the purpose of signifying to the train crew that the mill crew were ready for, and wished, the cars shoved down, but was on top of another car on the middle track, and seeing the cars moving down at a high speed, supposed that the signal had been given to strike the loaded cars, and jumped over on the loaded car to release the brakes. There was more or less conflict in the testimony, as to the speed of the train, as to whether the mill crew had warning of its approach, and as to various facts relating to the question of the negligence of the defendant. The jury found a verdict in plaintiff's favor and assessed his damages at the sum of $1,600. The defendant made a motion for a new trial, on the ground that the verdict was not justified by the evidence. The motion was granted, and plaintiff appealed.

*F. D. Larrabee* and *Davis, Kellogg & Severance,* for appellant.
*Albert E. Clarke* and *W. F. Booth,* for respondent.

VANDERBURGH, J. The trial court granted a new trial in this case on the ground that the verdict was not justified by the evidence. If the evidence in plaintiff's behalf was such as to require the case to be submitted to the jury, or if there was a conflict of evidence upon the question of defendant's negligence, it did not certainly so pre-

ponderate in favor of the verdict as to warrant an interference by this court with the decision of the trial court in granting a new trial upon the ground stated. In this view of the case it is not material that the court may have considered the plaintiff's evidence insufficient to establish the charge of negligence. In either view of the case there was no legal error in ordering that the issue be submitted to another jury. *Johnson* v. *St. Paul, M. & M. Ry. Co.*, 43 Minn. 53, (44 N. W. Rep. 884;) *Smith* v. *St. Paul & D. R. Co.*, 44 Minn. 17, (46 N. W. Rep. 149.)

We think also that the court did not err in submitting the issue of defendant's negligence to the jury. The accident in which plaintiff was injured occurred while he, with others, was engaged in loading flour from a mill into a car upon an adjoining side track. This was the business of these men, who are designated in the record as the "mill men." As soon as a car was loaded it was pushed down the track, which was on a descending grade, and its place supplied by others, placed on the track above by defendant to be loaded. The loaded cars were sometimes moved down by the mill men, but were ordinarily pushed down by the incoming cars. In loading, plank and skids were extended from the door of the mill into the cars, and used to facilitate the work. The negligence complained of is that the cars, on the occasion referred to, were backed down by the defendant without sufficient warning, and at an unusual and dangerous rate of speed, so that the plaintiff, who was at work about the cars, was suddenly caught and crowded in between the mill and the skid and injured, as the car, which was only partially loaded, was driven down the track. It was the business of the defendant to furnish cars for loading on the side track of the mill when required, and it was the custom of the mill men or their foreman to give seasonable notice to "the switching crew" charged with this duty, of the number of cars wanted. These cars were taken up the main track, switched onto the side track in question about one hundred and fifty feet above the mill, and then backed down to the mill.

The evidence in the case appears to us to be conflicting on several material points. In the absence of well-defined regulations for con-

ducting the business, certain usages had grown up, which the parties relied on, and to which they were expected to conform. And among them is evidence tending to show that it was the custom of some one of the switching crew to notify the mill men, or some one of them engaged in loading the cars, that the empty cars were about to be set in upon the side track, and to get ready for it; and also that it was the invariable rule, prior to the accident, to back the cars down so slowly as to cause no danger to the workmen, or sudden movement to the loaded cars standing on the track.

The defendant's evidence also tended to show that the presence of one of the mill men upon the standing cars was a signal to the train men that the car was loaded and ready to be moved forward on the track, and an invitation to them to back down against the standing cars. And, though the evidence tended to show that the train men in this instance failed to give the formal and customary notice that they were about to set in the cars, yet that McHugh, the foreman of the mill men, saw the cars transferred to the side track, and saw them coming down, and that Rouse, another of the mill men, was actually standing on the car where plaintiff was at work; and counsel for defendant therefore contends that this was sufficient notice, and an invitation to the train men to back the cars down as they did, and an assurance that the car was in readiness to be moved without risk, and, if so, the speed of the cars was immaterial. But McHugh testified, in substance, that when he discovered that the cars had been transferred, and were backing down on the inside track, they were moving so fast that he had not sufficient time to give the warning from the place where he stood in the street.

And Rouse, it seems, did not get up on the car for the purpose named. He was on the deck of another car on the middle track, and when he saw the transferred cars coming down he jumped over upon the car that was being loaded to release the brakes, supposing from the fact that they were approaching so rapidly, that the usual notice had been duly given by the train men; and the collision was at that time imminent, so that, if his evidence is true, the cars were not backed down by his invitation. If it be true that no notice was given by the train men, and McHugh and Rouse were surprised and

misled by the rapid approach of the cars, then the question whether they were moving at an unusual and reckless speed was material, because it was, under the circumstances, fraught with danger to the men. What the usages of the business were, whether or not they were complied with, or whether, if omitted, the omission was material, or whether the train men were themselves at fault or derelict in duty, and whether the speed of the cars was unusual or dangerous, were, we think, questions for the jury.

Order affirmed.

(Opinion published 52 N. W. Rep. 975.)